# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7540 | **DATE** | 3/26/2002 |
| **CASE TITLE** | Dr. Fred Richardson, Jr. vs. Rush-Presbyterian-St. Luke's Medical Center, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
        ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ☒  [Other docket entry]  Enter Amended Memorandum Opinion and Order withdrawing Footnote No. 3.

(11) ☒  [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices **2** |
| ✓ | Notices mailed by judge's staff. | **MAR 2 7 2002** date docketed |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | 3/15/2002 date mailed notice |
| | Copy to judge/magistrate judge. | |
| ETV | courtroom deputy's initials | ETV mailing deputy initials |

Document Number **65**

U.S. DISTRICT COURT
CLERK
02 MAR 26 PM 2:49

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DR. FRED RICHARDSON, JR.,      )
     )
       Plaintiff,      )
     )
       v.      )    No. 99 C 7540
     )
RUSH-PRESBYTERIAN-ST. LUKE'S      )     **Judge**
MEDICAL CENTER, RUSH MEDICAL      )    **Rebecca R. Pallmeyer**
COLLEGE, RUSH-PRESBYTERIAN-      )
ST. LUKE'S HEALTH ASSOCIATES,      )
DR. EDGAR STAREN, DR. DIANE HOMAN,    )
DEBRA DELLANINA, DR. ERICH E.      )
BRUESCHKE, and DR. WILLIAM SCHWER,    )
     )
       Defendants.      )

**DOCKETED**

MAR 2 7 2002

## AMENDED MEMORANDUM OPINION AND ORDER

Until August 24, 1998, Plaintiff Fred Richardson, a medical doctor, was a member of the faculty of Rush Medical College and salaried employee of Rush Presbyterian St. Luke's Medical Center[1] ("Rush"). Plaintiff was fired from his position as Assistant Dean for Minority Affairs of the Medical College on August 24, 1998. He characterizes his termination as the culmination of an alleged long-standing practice of discriminatory behavior directed by Rush at Richardson, an African American. Richardson filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission on January 28, 1999. He filed his ten-count complaint with this court on November 18, 1999, raising a variety of claims ranging from employment discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000(e) *et seq.*, to state law tort claims of breach of contract and tortious interference

---

[1]    Rush, a nonprofit corporation, is responsible for the oversight of Rush Medical College. (Def. Facts, ¶ 2.)

with prospective business expectancy.[2] Defendants counterclaimed with two state law claims of breach of contract. Before the court is Defendants' motion for summary judgment. For the following reasons, Defendants' motion is granted and judgment is entered in favor of all Defendants.

## FACTUAL BACKGROUND

Plaintiff graduated from Rush Medical College in 1987, and completed the Rush Family Medicine residency program in June of 1990. (Defendants' Statement of Material Uncontested Facts in Support of Their Motion for Summary Judgment ("Def. Facts"), ¶ 1.) Dr. Erich Brueschke, Chairman of the Rush Department of Family Medicine during Plaintiff's residency, was impressed by Plaintiff and believed a bright future lay ahead for him. (Defendants' Memorandum in Support of Their Motion for Summary Judgment (Def. Memo"), p. 1.) Upon Brueschke's recommendation, Rush employed Plaintiff in 1990 as a physician in an arrangement known as a Medical Service Plan (described below), and Plaintiff joined the faculty of Rush Medical College as an instructor. (Def. Facts, ¶¶ 1, 28.) In 1995, when Brueschke became Dean of Rush Medical College, he appointed Plaintiff as its first Assistant Dean for Minority Affairs. (Def. Facts, ¶¶ 1, 34.)

**Rush Employment Structure**

Rush requires that all medical doctors who admit patients to Rush also be

---

[2] Plaintiff identified Rush Presbyterian St. Luke's Medical Center, Rush Medical College, Rush-Presbyterian-St. Luke's Health Associates, Dr. Erich E. Brueschke, Dr. William Schwer, Dr. Edgar Staren, Dr. Diane Homan, and Debra Dellanina as defendants on the complaint. Plaintiff did not specify which Defendants are implicated in which counts, nor does his response to Defendants' motion for summary judgment differentiate claims among the various Defendants. As explained further below, this decision resolves all of the claims against all of the Defendants.

members of the faculty of Rush Medical College. (Def. Facts, ¶ 24.) The faculty members of Rush Medical College are required to participate in Rush's teaching mission, which involves working with medical students and residents, working on Rush Medical College's administrative matters, performing medical research, and teaching in both formal and informal settings. (Def. Facts, ¶ 24(a).) Most faculty members are not paid a salary for their participation in the teaching mission, but instead, provide teaching services as consideration for having admitting privileges at Rush. (Def. Facts, ¶ 24 (b).) For example, of the 157 Rush Department of Family Medicine faculty members employed during the 1998 fiscal year, only twenty-two received a salary for their work in the teaching mission. (Def. Facts, ¶ 24(b).)

Although physician facility members are not paid for teaching, the majority of physicians with admitting privileges at Rush do receive a salary for conducting research, working on administrative matters, and/or working in a Medical Service Plan. (Def. Facts, ¶ 25.) Their employment contracts and salaries are negotiated every fiscal year, which begins on July 1, and are based upon relevant budgets and their respective administrative assignments. (Def. Facts, ¶¶ 25(a) -(d).)

**Medical Service Plans**

A Rush Medical Service Plan ("MSP") is comparable to a private practice, the main difference being that the physician is employed by Rush. (Def. Facts, ¶ 26(a).) The MSP relationship is a contractual one in which Rush pays both a salary to the physician and all of the expenses associated with the physician's provision of medical services, including employees' salaries, utilities, medical supply costs, and malpractice insurance. (Def. Facts, ¶¶ 26(a) & (d).) The physician then turns over all revenue

generated by the treatment of patients to Rush; Defendants explain that the "entire structure of Rush MSPs depends upon Rush trusting doctors to turn over patient revenue and doctors trusting Rush to pay MSP expenses." (Def. Facts, ¶ 26(a) & (m).) Each MSP is supervised by the relevant medical department; Plaintiff's MSP was supervised by Dr. William Schwer, Chairman of the Rush Family Medicine department. (Def. Facts, ¶ 26(b).) The terms of the MSP contract are set through a yearly budgeting process that involves the chairperson of the supervising medical department (in Plaintiff's case, Schwer), the Dean of Rush Medical College, and the President of Rush. (Def. Facts, ¶¶ 26(c), (d), (g) & (h).)

**Plaintiff's MSP**

In order to establish his MSP practice in 1990, Plaintiff participated in the selection of both the site for his MSP (Oak Park, Illinois), and the equipment for his practice. Rush established an account into which Plaintiff would deposit the fees generated by the practice, and from which all expenses of the practice were to be paid. (Def. Facts, ¶¶ 28-29.) Metis Associates, Ltd. prepared a feasibility study of Plaintiff's MSP for Rush and projected the practice would produce consistent profits by the fourth year of operation.[3] (Def. Facts, ¶ 28; Defendants' Exhibits and Declarations in Support of Their Motion for Summary Judgment ("Def. Ex."), No. 15.) Instead, from fiscal year 1991 through fiscal year 1998, Plaintiff's MSP lost $972,986.89. (Def. Facts, ¶ 30.) In the spring of 1997, Schwer asked Plaintiff to provide a revised budget for fiscal year 1998. (Def. Facts, ¶ 31.) Plaintiff responded to Schwer's request by a letter dated July

---

[3]     The record does not specify the type of work that Metis Associates performs.

4

2, 1997 in which he acknowledged Schwer's request for revisions to the MSP budget, but said "[u]nfortunately, I cannot submit my revised budget by this date because I am considering other options through the Dean's Office. My situation is indeed unique and requires a creative solution. Please be patient as I await a response from the Dean." (Def. Facts, ¶ 31; July 2, 1997 Letter from Plaintiff to Schwer, Def. Ex. 19.)

On July 15, 1997, Schwer and Plaintiff met to discuss the future of Plaintiff's employment; the following day, Schwer sent Plaintiff a letter summarizing that discussion. (Def. Facts, ¶ 32; July 16, 1997 Letter from Schwer to Plaintiff, Def. Ex. 20.) The letter confirmed that Plaintiff had requested the termination of his MSP. (Def. Facts, ¶ 32; July 16, 1997 Letter from Schwer to Plaintiff, Def. Ex. 20.) In his affidavit submitted to this court, however, Plaintiff characterized his request as a request to transfer the ownership of the MSP to himself, a transfer that would, in this court's understanding, also result in termination of Plaintiff's MSP relationship with Rush. (Affidavit of Dr. Fred Richardson, Jr. ("Plf. Aff."), ¶ 9.) Schwer's July 16 letter set forth the following terms for the termination of Plaintiff's MSP: Plaintiff's MSP salary would be terminated, Plaintiff would be responsible for his own malpractice insurance, Plaintiff would assume all rent and staff support expenses, Rush would be entitled to collect all revenues generated while Plaintiff was still in the MSP, and Plaintiff would reimburse Rush for the MSP's fiscal year 1997 losses of $112,000. (Def. Facts, ¶ 32; July 16, 1997 Letter from Schwer to Plaintiff, Def. Ex. 20.) The letter also reflected that Plaintiff himself requested that any other department salary support from grants, Rush Medical College, or hospital operations dollars also be terminated. (Def. Facts, ¶ 32; July 16, 1997 Letter from Schwer to Plaintiff, Def. Ex. 20.)

Schwer and Plaintiff agreed, however, that despite this change in Plaintiff's private medical practice, Plaintiff would continue his teaching responsibilities in his office for medical students and residents and would continue in his position as Assistant Dean for Minority Affairs. (Def. Facts, ¶ 32; July 16, 1997 Letter from Schwer to Plaintiff, Def. Ex. 20.) Schwer informed Plaintiff that his salary for his position as Assistant Dean for Minority Affairs would be determined by the Dean's Office and that Schwer and Plaintiff would both need to sign a new faculty contract reflecting that salary. (Def. Facts, ¶ 32; July 16, 1997 Letter from Schwer to Plaintiff, Def. Ex. 20.) Plaintiff claims that he "objected to Dr. Brueschke concerning the letter" from Schwer; Plaintiff does not identify either the form or the substance of this objection, nor does he state when he expressed this objection. (Plf. Aff., ¶ 28.) Rush never paid Plaintiff for being an Assistant Professor at Rush or for his medical teaching responsibilities. (Def. Facts, ¶ 36.) Plaintiff testified in his deposition that he had hope in fiscal year 1998 to be compensated for teaching once he was no longer in the MSP relationship with Rush. (Def. Facts, ¶ 37.) Plaintiff does not claim to have communicated this hope to Schwer, however.

Plaintiff hired David Griffin of Physicians Management Service in the summer of 1997 to represent him in his negotiations to terminate the MSP arrangement.[4] (Def. Facts, ¶ 50.) As the negotiations proceeded through the fall of 1997, the correspondence between Griffin and Schwer reflected Plaintiff's request that he be allowed to retain the accounts receivable for moneys earned before the termination of the MSP, amounts that, under the MSP, belonged to Rush. (Def. Facts, ¶ 50.) For

---

[4] The record does not identify Griffin's background or training.

example, in a letter dated September 22, 1997 from Griffin to Schwer, Griffin emphasized: "We seek certain financial reliefs including the addition of a forgiveness clause to the outstanding student loan, the allocation of A/Rs [accounts receivable] to the [Plaintiff's] practice effective on the date of separation. . . ."  (September 22, 1997 Letter from Griffin to Schwer, Def. Ex. 22.)

Prior to the termination of the MSP contract, Plaintiff, on November 28, 1997, unilaterally stopped remitting to Rush the fees he received from patients for performing medical services. (Def. Facts, ¶ 62.) Plaintiff states in his affidavit: "On or about November, 1997, Brueschke orally advised me that I no longer needed to submit daily receipts and thereby could begin to retain them in preparation for the purchase and sale of my Practice." (Plf. Aff. ¶ 15.) Defendants deny that Brueschke ever gave Plaintiff permission to keep the accounts receivable and cash flow of the MSP. (Defendants' Reply to Plaintiff's Response to Defendants' Statement ("Def. Reply"), p. 33.)

Rush and Plaintiff continued to negotiate the terms for termination of the MSP contract and sale of the practice to Plaintiff. On December 4 and December 12, 1997, Rush sent Griffin drafts of the purchase and sale agreement.[5] (Def. Facts, ¶ 52.) In the December 12 version of the agreement, the only salary Rush offered to pay Plaintiff was $55,000 for his work as Assistant Dean for Minority Affairs. (Def. Facts, ¶ 54; December 12, 1997 Draft Agreement of Purchase and Sale, Def. Ex. 27.)  Griffin

---

[5]     The court notes that Rush apparently acceded to at least some of Griffin's and Plaintiff's demands:  These early drafts of the purchase and sale agreement excused Plaintiff from the obligation that he credit Rush for accounts receivable prior to the date for closing of the agreement.

acknowledged to David Rice of the Rush Office of Legal Affairs, that the December 12 draft reflected the understanding of the parties, but Griffin informed Rice that, contrary to Griffin's advice, Plaintiff nevertheless refused to sign the agreement due to his dissatisfaction with the proposed salary. (Def. Facts, ¶ 53, 56-57; December 19, 1997 Letter from Rice to Dressler, Def. Ex. 32.)

Griffin ultimately withdrew his representation of Plaintiff in the negotiations. (Def. Facts, ¶ 58.) In a December 15, 1997 letter to Plaintiff, Griffin explained:

> It was our understanding as late as last week, that the objective was to have the transfer of your practice completed to you without cost of purchase, free of any operating deficiencies being included in the agreement and that all accounts receivable went to you with the sale. We believe this agreement accomplishes those objectives without question nor conditions. . . . The rising [sic] of new issues following a review by your attorney to Rush may result in unpredictable responses by Rush. . . . I cannot predict how Rush will respond to this change of position.

(December 15, 1997 Letter from Griffin to Plaintiff, Def. Ex. 29.) Griffin also wrote to Plaintiff's attorney, Peter Dressler, advising him: "I believe Rush has taken a major stretch in agreeing with the terms offered. It is a deal that I would urge any client to take."[6] (Def. Facts, ¶ 59; December 15, 1997 Letter from Griffin to Dressler.)

Dressler represented Plaintiff throughout the remainder of the negotiations. (Def. Facts, ¶ 61.) In a January 20, 1998 letter to Dressler, Plaintiff explained that he had informed Rush that he did not wish to be compensated by the MSP or by the Rush Department of Family Medicine.[7] (Def. Facts, ¶ 64; January 20, 1998 Letter from Plaintiff to Dressler, Def. Ex. 34.) Plaintiff further told Dressler that he did not think

---

[6]     The record does not specify when Plaintiff retained Dressler.

[7]     This letter was apparently produced by Plaintiff, and no claim of privilege has been raised.

that Rush's offer of a $55,000 salary for his position as Assistant Dean for Minority Affairs was sufficient, but nowhere in this letter did Plaintiff claim he expected to receive a salary for teaching. (Def. Facts, ¶ 64; January 20, 1998 Letter from Plaintiff to Dressler, Def. Ex. 34.)

Rush learned in February 1998 that the patient revenue deposits for Plaintiff's MSP had dropped to zero. (Def. Facts, ¶ 66.) Dr. Janis Orlowski, Assistant Dean and Vice President, wrote Plaintiff on February 13, 1998 requesting a prompt explanation for Plaintiff's failure to deposit patient revenues as required by the MSP contract and by the Internal Revenue Service. (Def. Facts, ¶ 67; February 13, 1998 Letter from Orlowski to Plaintiff, Def. Ex. 37.) Attorney Dressler responded to Orlowski's letter on February 16, 1998, advising her that Plaintiff had set up a corporation that was receiving the patient deposits and that this was done "consistent with and in furtherance of the transfer of the Clinic to [Plaintiff] as approved and desired by Rush." (Def. Facts, ¶ 68; February 16, 1998 Letter from Dressler to Orlowski, Def. Ex. 38.) Orlowski wrote to Plaintiff on February 18, 1998 pointing out that, although Rush and Plaintiff were in the midst of negotiations to terminate the MSP, "this agreement has not been consummated," and that Rush continued to accrue the expenses of Plaintiff's MSP. (Def. Facts, ¶ 72; February 16, 1998 Letter from Dressler to Orlowski, Def. Ex. 38.) Orlowski further advised Plaintiff that she believed his incorporation prior to an agreement "appears to show bad faith. . . ." (February 16, 1998 Letter from Dressler to Orlowski, Def. Ex. 38.) Throughout fiscal year 1998, however, Rush continued to pay Plaintiff's MSP salary, the rent for the MSP property, the salary of a Rush employee working for the MSP, and other MSP expenses. (Def. Facts, ¶ 73.)

Brueschke pointed out in the affidavits he submitted to the court in this case that no other doctor, party to a Rush MSP contract, has ever withheld patient revenues. (Def. Facts, ¶ 70.)

On February 19, 1998, Plaintiff notified Brueschke about an incident of racial harassment of a medical student by a professor. (Def. Facts, ¶ 74.) Brueschke investigated the incident and disciplined the professor involved on March 25, 1998. (Def. Facts, ¶ 74.) In his March 25, 1998 letter, Brueschke advised the professor that he was barred from acting as a course director for 18 months, ineligible for a promotion in faculty rank for two years, required to engage in sensitivity training, and warned to be particularly attentive to the manner in which he interacted with students, especially with regards to sexual harassment issues.[8] (March 25, 1998 Letter from Brueschke to Professor, Def. Ex. 33.) Plaintiff asserts that he first reported this incident of harassment by a professor to Dr. Edgar Staren, the Associate Dean for Medical Student Programs, to whom Plaintiff directly reported in his capacity as Assistant Dean of Minority Affairs. (Plaintiff's Answer to Defendants' Memorandum in Support of Their Motion for Summary Judgment ("Plf. Response"), p.10.) Plaintiff also asserts that the professor's imposed discipline was overturned, but he offers no evidence in support of his assertion. (Plf. Aff. ¶ 22; Def. Reply, p. 43.)

Plaintiff sent a letter to Brueschke on February 25, 1998 in which he alleged that he was the victim of conspiracy, discrimination and a cover-up, and that his constitutional rights were violated. (Def. Facts, ¶ 76; February 25, 1998 Letter from

---

[8]     It is not clear why, although Plaintiff first raised this as an allegation of racial harassment, Brueschke warned the professor to be careful regarding sexual harassment.

Plaintiff to Brueschke, Def. Ex. 41.) Plaintiff's letter does not identify any facts or circumstances to substantiate his claims, but insists that there be a "formal inquiry of the [unidentified] events surrounding the above allegations." (February 25, 1998 Letter from Plaintiff to Brueschke, Def. Ex. 41.) Plaintiff further demanded "acceptable verbiage for the transfer of all assets," and threatened that if Rush did not agree to Plaintiff's terms by the end of the February 25, 1998 workday, "these negotiations will end and the process of fact finding will continue with anticipation of a discriminatory [sic] lawsuit filed in the very near future by the Assistant Dean for Minority Affairs with the intent of ridding the sacred institution of RUSH of every element of Racism in existence, past, present and future." (February 25, 1998 Letter from Plaintiff to Brueschke, Def. Ex. 41.)

Plaintiff's demands, set forth in the February 25 letter, included: that Plaintiff would pay ten dollars and incur none of the practice's outstanding debts or liabilities; that Plaintiff would be entitled to all accounts receivable; that Rush would forgive all of Plaintiff's student loans and all of the MSP's losses; that Rush would contribute an amount of capital to Plaintiff's practice in an amount to be determined by Plaintiff; that Rush would promote Plaintiff to a new position of Dean for Minority Affairs and make him an Associate Professor of Family Medicine; that Plaintiff would be given a substantial budget in an amount to be determined by himself for his work as Dean for Minority Affairs; that as Dean for Minority Affairs, Plaintiff would select individuals to go through cultural sensitivity training, some of whom would, at Plaintiff's discretion, undergo an "extended course in such training;" and that Plaintiff, as Dean, would receive an annual salary of $225,000 for 1998, increasing every year over the

11

term of the lifetime contract he would be given as of February 25, 1998. (February 25, 1998 Letter from Plaintiff to Brueschke, Def. Ex. 41.) Rush declined Plaintiff's offer.

The same day that Plaintiff gave this letter to Brueschke, February 25, 1998, Plaintiff, Dressler, Brueschke, and Max Brown, General Counsel of Rush, met to discuss the termination of the MSP. (Def. Facts, ¶ 78.) It is not clear from the record whether Plaintiff gave his demand letter to Brueschke before, during, or after this meeting. At the meeting, Plaintiff turned over $7,503 in patient revenues, reporting that he had spent the rest of the patient fees he had collected. (Def. Facts, ¶ 78.) Plaintiff contends that he gave Rush this money in response to a deal offered by Brown. (Plf. Aff. ¶ 18.) As Plaintiff explains it, Brown told him that if Plaintiff withdrew his allegations of discrimination, Rush would discontinue legal proceedings against Plaintiff; alternatively, Plaintiff could write a check for the patient fees he still had and Rush would continue with legal proceedings for the balance. (Plf. Aff. ¶ 18.) Defendants deny that any deal was offered to Plaintiff, and point out that the facts belie such a suggestion: Plaintiff did write a check and Rush neither instituted nor continued legal action against Plaintiff, but instead only became involved in legal proceedings with Plaintiff when he sued Defendants in the present lawsuit. (Def. Reply, p. 45.) At the meeting, Brueschke and Brown offered to seek the assistance of an outside professional mediator to mediate Plaintiff's claims of discrimination. (Def. Facts, ¶ 79.) Plaintiff again refused to sign any agreement for purchase and sale of his practice. (Def. Facts, ¶ 80.)

On or around March 4, 1998, Plaintiff closed his medical office to new patients and non-emergency patients. (Def. Facts, ¶81; March 4, 1998 Letter from Plaintiff to

Dressler, Def. Ex. 43.) Plaintiff wrote a letter to Dressler on March 4, 1998 in which he and "his family demand[ed] an immediate response by RUSH" to the letter that he gave to Brueschke and Brown on February 25, 1998, and in which he stated that his practice has been temporarily closed "secondary to Rush's bad faith actions." (March 4, 1998 Letter from Plaintiff to Dressler, Def. Ex. 43.) Plaintiff did not describe these alleged bad faith actions, but noted that he no longer had any staff, without explaining Rush's responsibility, if any, for his loss of staff. (March 4, 1998 Letter from Plaintiff to Dressler, Def. Ex. 43.) In the affidavit he submitted in this case, Plaintiff asserted that he closed the practice because Rush threatened to stop paying his staff's salary. (Plf. Aff. ¶ 31.) It is clear from the record that the MSP's staff was comprised of one employee whose salary was in fact paid by Rush throughout the duration of his or her employment. (Def. Facts, ¶ 73.) Plaintiff closed the letter to Dressler with the warning that Rush had until noon on March 4, the same day he wrote the letter, to agree to the terms of his February 25, 1998 letter. (March 4, 1998 Letter from Plaintiff to Dressler, Def. Ex. 43.)

Dressler communicated his client's concerns and demands to Brown by forwarding to Brown a copy of Plaintiff's March 4 letter. (March 6, 1998 Letter from Schwer to Plaintiff, Def. Ex. 44.) On March 6, 1998, Schwer responded with a letter to Plaintiff explaining that, because the purchase and sale agreement for the practice had not yet closed, Plaintiff was not entitled to unilaterally cease operation of the practice. (March 6, 1998 Letter from Schwer to Plaintiff, Def. Ex. 44.) Schwer did not respond to the demands set forth in Plaintiff's February 25 letter. Schwer and Brueschke explained in their affidavits that throughout this time, they were concerned

13

about the continuity of patient care at Plaintiff's MSP, and Rush's potential legal liability for any interruption in such patient care. (Def. Facts, ¶ 85.)

Also in March of 1998, Avery Miller, Rush Vice President for External and Corporate Affairs, was preparing information for Rush's new patient referral internet site, "Rush on Call." (Def. Facts, ¶ 84.) Miller was aware that Plaintiff had closed his office to new and non-emergency patients, and also knew that Plaintiff had been withholding all patient revenues from Rush. (Def. Facts, ¶ 84.) For these reasons, Miller decided it would be imprudent from both a medical and financial standpoint for Rush to refer patients to Plaintiff, and he directed the Rush on Call staff to delete Plaintiff's name from the site. (Def. Facts, ¶ 84.) It turned out that Plaintiff's name was only successfully removed from the Rush on Call telephone directory, and was not removed from the internet site until August 1999. (Def. Facts, ¶ 84, fn. 4.) In March of 2000, for reasons not explained in the record, Rush invited Plaintiff to rejoin the Rush on Call system, but Plaintiff declined, because, as he explained in his deposition, he was more interested in figuring out why he had been removed than in being reinstated. (Def. Facts, ¶ 84, fn. 4; Plaintiff's Deposition, Def. Ex. 99.)

During March, April, and May of 1998, Rush continued to pay Plaintiff his MSP salary and continued to pay the MSP's expenses, while Plaintiff continued to retain all patient revenues. (Def. Facts, ¶ 86.) Rush attempted to arrange for mediation of Plaintiff's complaints against Rush, and communicated with Plaintiff's new attorney, Arlene Coleman, about the proposed mediation. (Def. Facts, ¶ 87.) Specifically, in a letter from its attorney, Leslie Ann Jones, Rush requested that Coleman furnish a detailed list of Plaintiff's grievances. (Def. Facts, ¶ 87; March 23, 1998 Letter from

Jones to Coleman, Def. Ex. 45.) Plaintiff never offered such a list, but instead, renewed his demand for a wholesale transfer of the medical practice including all accounts receivable, a waiver of all debts and loans owed by Plaintiff, and further promotions and salary raises from Rush. (April 17, 1998 Letter from Coleman to Jones, Def. Ex. 46.) Jones responded to Coleman's letter on April 20, 1998, suggesting that there must have been a misunderstanding between the parties concerning the proposed mediation; Jones observed that although Coleman's letter presented Plaintiff's demands, "it d[id] not identify the reasons he feels these demands are justified," and pointed out that Rush still awaited Plaintiff's list of specific grievances. (April 20, 1998 Letter from Jones to Coleman, Def. Ex. 47.)

On May 8, 1998, Jones wrote a letter to both Coleman and Dressler, setting forth Rush's final offer with respect to the termination of the MSP and the sale of the practice. (Def. Facts, ¶ 90; May 8, 1998 Letter from Jones to Coleman and Dressler, Def. Ex. 48.) Noting the MSP's significant financial losses, Jones advised that Rush would not continue paying the MSP's expenses or Plaintiff's MSP salary after June 30, 1998, the end of the fiscal year. (Def. Facts, ¶ 90; May 8, 1998 Letter from Jones to Coleman and Dressler, Def. Ex. 48.) Rush gave Plaintiff two options: (1) to accept the previously negotiated purchase and sale agreement, or (2) to accept employment at the professional building at Oak Park Hospital where all billing and administrative matters would be handled by personnel other than Plaintiff, and he would be paid the same salary he earned in the MSP arrangement. (Def. Facts, ¶ 90; May 8, 1998 Letter from Jones to Coleman and Dressler, Def. Ex. 48.)

On May 13, 1998, Plaintiff sent a memorandum, the subject of which he labeled

"Official Protest Notice," to Brueschke, Staren, and Schwer, notifying them that he was "officially protesting [his] administrative/teaching duties." (May 13, 1998 Memorandum from Plaintiff to Brueschke, Staren, and Schwer, Def. Ex. 49.) Brueschke responded the following day with a letter reminding Plaintiff that the status of his MSP was separate from and did not affect his status or duties as the Assistant Dean for Minority Affairs. (May 14, 1998 Letter from Brueschke to Plaintiff, Def. Ex. 50.) Brueschke also pointed out that Plaintiff had taken on new responsibilities as the coordinator of the Robert Wood Johnson Foundation Minority Medical Education Program which was to begin on June 14, 1998, and warned Plaintiff that if he did not intend to fulfill those responsibilities, as well as his responsibilities as the Associate Dean for Minority Affairs, Rush would have no choice other than to remove him as Associate Dean. (May 14, 1998 Letter from Brueschke to Plaintiff, Def. Ex. 50.)

On May 18, 1998, Plaintiff sent both a memorandum to Brueschke stating that he intended to remain at Rush Medical College in the Office of Minority Affairs, and a six and one-half page single-spaced letter to Brueschke outlining Plaintiff's "alarming concerns" about Staren. (Def. Facts, ¶¶ 94, 96; May 18, 1998 Memorandum from Plaintiff to Brueschke, Def. Ex. 51; May 18, 1998 Letter from Plaintiff to Brueschke, Def. Ex. 52.) Plaintiff informed Brueschke that he was also turning this issue over to his attorney who "specializes in civil rights, race relations and employment discrimination and harassment issues." (*Id.*) In the letter about Staren, Plaintiff noted the stark contrast between Staren and Staren's predecessor, Dr. Larry Goodman, who had praised Plaintiff's work "on a consistent basis" and of whom Plaintiff had videotaped statements about the excellent job that Plaintiff was doing. (*Id.*)

Plaintiff's letter complained that Staren's first act was to "displace" Plaintiff's secretary, "an exceptional minority woman," and replace her with Staren's former secretary, but Plaintiff was "ultimately . . . forced to replace her with an answering machine." (*Id.*) Plaintiff also reported that Staren "supported a poorly conducted" AOA Honor Society survey because Dr. Clarence Parks, the David Peck Award winner, was not elected to the AOA Honor Society that year.[9] (*Id.*) Plaintiff pointed out that Staren "failed to sincerely apologize" to Plaintiff for not informing Plaintiff that a minority medical student had experienced a psychiatric crisis on April 29, 1997. (*Id.*) Plaintiff highlighted Staren's alleged inadequate handling of Plaintiff's report that a minority medical student had been harassed by a professor: Staren talked to the professor and concluded there was a plausible explanation for the incident. (*Id.*) Furthermore, Staren admonished Plaintiff when he learned that Plaintiff had gone over Staren's head to complain about the incident. (*Id.*) Finally, Plaintiff complained that the minority medical students at Rush Medical College viewed Staren as insensitive and non-responsive to minority crisis situations, and that when Plaintiff tried to address this problem with him, he refused to address these concerns. (*Id.*) In response to this letter, Brueschke removed Staren as Plaintiff's supervisor, taking that responsibility on himself, and undertook an investigation of Plaintiff's allegations. (Def. Facts, ¶ 97.)

Attorney Coleman sent one final letter on Plaintiff's behalf on May 18, 1998.

---

[9] In his submissions to this court, Plaintiff did not explain what the AOA Honor Society is or how it selects its members, nor did he provide any information about the David Peck Award.

(Def. Facts, ¶ 95.) In this letter, Coleman told Rush's attorney that Plaintiff would not proceed with the proposed mediation of his grievances, because, according to Coleman, Rush handled Plaintiff's MSP differently than other non-minority MSPs and treated his MSP differently once Plaintiff spoke up about race relations at Rush. (May 18, 1998 Letter from Coleman to Jones, Def. Ex. 53.) Coleman further claimed that Plaintiff had been subject to "verbal insults, scorn and ridicule." (May 18, 1998 Letter from Coleman to Jones, Def. Ex. 53.) Coleman did not explain in what way Plaintiff's MSP was treated differently than other non-minority MSPs, nor did she offer a single example of the insults allegedly directed at Plaintiff.

On June 16, 1998, Rush filed a complaint for declaratory and injunctive relief against Plaintiff in the Circuit Court of Cook County. (Def. Facts, ¶ 98.) Specifically, Rush sought an order to permit notices to be sent to Plaintiff's patients informing them that Plaintiff was no longer employed by Rush to provide medical care, and to obtain all financial records and accounts receivable pertaining to Plaintiff's MSP. (Verified Complaint for Declaratory and Injunctive Relief, Def. Ex. 59.) The parties have not identified the resolution, if one has been reached, of this action. The record does reflect, however, that just over a week later, on June 27, 1998, Plaintiff signed the purchase and sale agreement and agreed to produce financial records concerning his expenditure of MSP revenues. (Def. Facts, ¶ 99.) The agreement Plaintiff signed stated that "any monies actually received by the Practice prior to June 30, 1998" were "Excluded Assets . . . which will remain the property of [Rush]. . . ." (Def. Facts, ¶ 99; Purchase and Sale Agreement, Def. Ex. 60.)

During June and July of 1998, Brueschke continued his investigation of

Plaintiff's allegations regarding Staren, and requested an interview with Plaintiff to discuss the allegations. (Def. Facts, ¶ 102.) Plaintiff insisted that his attorney attend the interview with him, but later refused to attend the meeting at all when it became clear that the only topic of discussion was to be Plaintiff's discrimination charges, and not Plaintiff's demands for an increased salary as Assistant Dean for Minority Affairs. (Def. Facts, ¶ 104; July 30, 1998 Letter from Coleman to Rice of the Rush Office of Legal Affairs, Def. Ex. 67.) Brueschke based his investigation, therefore, on facts gathered from all relevant parties except Plaintiff, and Brueschke concluded in an August 6, 1998 letter to Plaintiff that the charges of discrimination were unfounded. (Def. Facts, ¶ 107.)

In late July 1998, Plaintiff submitted financial records to Rush regarding his expenditure of the patient revenue funds between November 28, 1997 and June 30, 1998. (Def. Facts, ¶ 109.) During this time, Plaintiff retained $55,826.46 in patient fees, and spent the money on such purely personal expenses as attorney's fees for his negotiations with Rush, lunches in the Rush Executive Dining Room, and payments on his credit card. (Def. Facts, ¶ 110.) None of these expenditures were authorized by Rush, nor were they processed through the normal Rush MSP budget practice. (Def. Facts, ¶ 111.)

On July 24, 1998, Coleman wrote a letter to Plaintiff explaining that she would not assist him in filing an EEOC claim against Rush.[10] (Def. Facts, ¶ 117; July 24, 1998 Letter from Coleman to Plaintiff, Def. Ex. 70.) Coleman explained to Plaintiff

---

[10] Plaintiff presumably produced this letter to Defendants and has not raised a claim of privilege with respect it.

that Illinois has an at-will employment status policy, and that Rush was entitled to terminate his employment at any time and for any reason, other than his status as a member of a constitutionally protected class. (*Id.*) Coleman further explained the reasons she believed that a disparate impact race discrimination claim against Rush would likely fail. (*Id.*) Finally, she told Plaintiff that Rush would likely respond to litigation by producing correspondence from Plaintiff to Rush administrators that "could be construed as hostile or confrontational."

On July 25, 1998, Dr. Robert Rosen informed Brueschke that Plaintiff had attended a meeting of the Rush Committee on Student Education Programs on July 22, 1998 and that, at this meeting, Plaintiff had been hostile towards both Rosen and other faculty members in the presence of medical students. (Def. Facts, ¶ 108.) In his affidavit submitted to the court, Plaintiff observes that there was only one medical student and one faculty member at the meeting, but he does not deny Rosen's characterization of his behavior. (Plf. Aff. ¶ 34.)

On August 24, 1998, Brueschke fired Plaintiff from his position as Assistant Dean for Minority Affairs, citing three bases for the decision: (1) the misuse of Rush funds; (2) the abuse of the grievance process; and (3) hostile and confrontational conduct. (Def. Facts, ¶ 116; August 24, 1998 Letter from Brueschke to Plaintiff, Def. Ex. 73.) Schwer explained in his affidavit that two medical students who had been working as interns with Plaintiff were removed from that assignment and given another one because of both the "emotional nature of a discharge," as well as all of the reasons that supported Plaintiff's discharge. (Def. Facts ¶ 118; Affidavit of William Schwer, Def. Ex. 85.)

On one occasion in September 1998, Marsha Bellinger, Scher's secretary at that time, prepared a notice for an upcoming meeting and deleted Plaintiff's name from the roster of the Family Medicine Department members. (Def. Facts, ¶ 161.) Bellinger mistakenly believed that Plaintiff's recent discharge included his faculty position. (*Id.*) Schwer learned about the omission at the meeting which the notice concerned, and immediately directed that Plaintiff's name be restored to the roster. (*Id.*)

## Health Insurance Cancellation

At the end of fiscal year 1998, when Plaintiff's employment related to the MSP ended, an administrative notice issued, indicating that Plaintiff had gone from being a full-time employee to 25 hours of "work."[11] (Def. Facts, ¶ 120.) An unidentified employee in the Rush Human Resources department interpreted this notice to mean that Plaintiff was now a part-time restricted employee. (*Id.*) Because part-time restricted employees are not entitled to health insurance benefits at Rush, the Human Resources department sent Plaintiff a notice that his health insurance was cancelled. (*Id.*) Later in July of 1998, the Human Resources department learned that the word "work" on the notice should have been "week," and that it was never the intention of the Department of Family Medicine to cancel Plaintiff's insurance. (Def. Facts, ¶ 121.) The Human Resources department immediately arranged for Plaintiff's insurance to be re-instated at the rate of a full-time employee, a rate in excess of what Plaintiff was entitled to receive. (*Id.*) No medical bills went unpaid during the one-week lapse in Plaintiff's health insurance. (Def. Facts, ¶ 124.) Plaintiff does not dispute that he

---

[11]     The record is not clear as to who prepared this notice.

suffered no financial loss due to the lapse in coverage, but instead insists that his "peace of mind was damaged by this discriminatory act." (Plf. Memo, p. 44.) Plaintiff further "hypothesized . . . that this form was completed by either Schwer or even his secretary Bellinger, of whom both have engaged in prior discriminatory acts against [Plaintiff]." (*Id.*)

**Health Associates**

Rush Presbyterian St. Luke's Health Associates ("Health Associates")[12] is a not-for profit taxable corporation with evenly divided ownership between Rush and the doctors on staff at Rush. (Def. Facts, ¶ 125.) Its primary purpose is to contract with purchasers of health care services, such as insurance companies and health maintenance organizations, to provide health care services to individuals who are members of the purchasers' health plans. (Def. Facts, ¶ 126.) Plaintiff entered into a Participating Physician Agreement with Health Associates on November 3, 1994, and resigned from Health Associates on February 21, 1999, effective May 11, 1999. (Def. Facts, ¶¶ 127-28.) Plaintiff alleges that Health Associates breached his contract by ceasing to advertise his services, blocking the assignment and referral of members to him, and ceasing to notify him of new purchase contracts. Plaintiff claims that Dr. Thomas Dent, the president of Health Associates and an associate professor of family medicine at Rush Medical College, "had knowledge of Rush College's views of [Plaintiff]" and that his "knowledge obtained through his dealings with the department of Family Medicine will be imputed to Health Associates." (Plf. Response, p. 43.)

---

[12] Health Associates is a defendant in this case.

Health Associates asserts that it treated Plaintiff exactly as it treated other member physicians: his medical services were advertised in the same manner as all other member physicians; he was assigned new patients in the same manner as all other member physicians; he was notified of new purchase contracts in the same manner as all other member physicians; and as with all other member physicians that resign from Health Associates, Health Associates notified contractors and individual patients at the time of Plaintiff's resignation that Plaintiff's services would no longer be paid for by that plan. (Def. Facts, ¶ 131.) The only evidence Plaintiff offered concerning his claims was a handful of provider directories that did not include his name. Notably, however, the only directories he presented were either prepared before Health Associates had a contract with the provider, or listed specialists, rather than family medicine practitioners. (Def. Facts, ¶ 137.)

**Hephzibah Children's Association**

Hephzibah Children's Association ("Hephzibah") is a not-for-profit corporation in Oak Park, Illinois that provides shelter and orphanage services through the Illinois Department of Children and Families Services ("DCFS"), to children that are wards of the State of Illinois. (Def. Facts, ¶ 138.) Plaintiff began providing routine medical care to children at Hephzibah in 1990 or 1991. (Def. Facts, ¶ 139; Plf. Memo, ¶ 47.) In 1994, DCFS instituted a program called Healthworks to improve the continuity and quality of medical care that foster children receive, but Plaintiff did not become a part of the Healthworks system. (Def. Facts, ¶ 140.) Because he was not part of this program, Hephzibah was able to continue using Plaintiff's services only with special approval from DCFS. Over time, this arrangement necessitated more and more paper

work. (*Id.*) For this reason, in December of 1997, Davida Ellen Williams, the Hephzibah Director of Group Homes, decided to begin using a different doctor for the children's routine medical care, although a few of the children that had been with Hephzibah longer continued to see Plaintiff on rare occasions. (Def. Facts, ¶¶ 140, 141.) On May 12, 1998, Williams notified Plaintiff by fax that all Hephzibah children would now be seen by a different doctor. (Def. Facts, ¶ 142.) Williams made this decision entirely on her own, without influence or input of anyone from within Hephzibah or from Rush. (Def. Facts, ¶¶ 143-46; Affidavit of Davida Ellen Williams, Def. Ex. 93.)

Mary Ann Brown, Hephzibah's Executive Director, is married to Max Brown, General Counsel for Rush. (Plf. Memo, p. 48.) In Plaintiff's view, "it can be reasonably inferred that . . . Max Brown discussed these dealings with his wife" and that she "terminated Hephzibah's relationship with [Plaintiff] due to these conversations that she had with her husband. . . ." (*Id.*)

**The Promissory Note**

In October 1994, Plaintiff and Rush executed a Promissory Note under which Rush lent Plaintiff $93,657.39 at an eight percent interest rate, with payments to be made in monthly installments of $ 1,136.33. (Def. Facts, ¶ 147; Promissory Note, Def. Ex. 6.) The Promissory Note provides that "[f]ailure to pay any part of the principal or interest of this Note when due . . . or termination of Physician's employment by [Rush] shall authorize [Rush] to declare as immediately due and payable the then unpaid principal balance and accrued interest and to exercise any and all . . . rights and remedies at law or equity possessed by [Rush]." (Promissory Note, Def. Ex. 6.)

Plaintiff consistently made his monthly payments until June 1999, but has not made any payments since then. (Def. Facts, ¶ 149.) As of April 23, 2001, the unpaid principal balance and accrued interest was $72,384.76. (Def. Facts, ¶ 150.) Plaintiff does not deny that he stopped making payments on the loan, nor does he deny the validity of the Promissory Note. (Plf. Memo, p. 56.) He alleges, instead, that Rush has not complied with the following provision: "Should you terminate your employment with Rush the repayment of the unpaid balance of this promissory note will be negotiated between yourself and the Dean of Rush Medical College in a manner which is satisfactory to the Dean." (*Id.* at 56-57.)

## DISCUSSION

### Summary Judgment Standard

The standards for evaluating a motion for summary judgment are familiar. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Dyson v. City of Chicago*, No. 01-2095. __ F.3d __, 2002 WL 272774 (7th Cir. Feb. 27, 2002). The court's function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In making this determination, the court will construe facts and draw inferences in the light most favorable to the nonmoving party, *see id.* at 255, but the nonmoving party may not "merely allege the existence of a factual dispute to defeat summary judgment," and must instead offer evidence sufficient to support a verdict in his favor. *Basith v. Cook*

*County*, 241 F.3d 919, 926 (7th Cir. 2001), *quoting McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000). Although some decisions have suggested that courts must use "added rigor" in deciding summary judgment motions in employment discrimination cases, the Seventh Circuit has recently confirmed that the standards for deciding such a motion are the same as in any other case. *Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 680 (7th Cir. 2001).

## Claim of Discriminatory Policies and Practices

Plaintiff claims that Defendants have systematically engaged in discriminatory practices that disparage African Americans, including himself. (Plf. Memo, p.23.) Specifically, Plaintiff claims that Defendants have: (1) limited the number of African Americans in teaching, administrative and MSP positions; (2) segregated African American physicians so that the only administrative position for which they qualify is Assistant Dean for Minority Affairs; and (3) restricted other employment opportunities to non-African Americans. (Plf. Memo, p.23-24.) Plaintiff did not explain what other employment opportunities have allegedly been made available only to non-African Americans, nor does he identify administrative positions from which he or other African Americans are barred.

Defendants point out that Plaintiff does not allege that he was injured by any of the aforementioned policies, but, to the contrary, admits that he taught, held the administrative position of Assistant Dean for Minority Affairs, and had an MSP contract. Absent such an allegation, Defendants urge, Plaintiff does not have standing to bring a disparate impact claim. They cite *Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661 (7th Cir. 1996) where the Seventh Circuit held that, "[i]n order for an

individual plaintiff to have constitutional standing to bring a Title VII action, he must show that he was personally injured by the defendant's alleged discrimination and that his injury will likely be redressed by the requested relief." *Id.* at 668.

The court notes that Plaintiff himself did not initially label his claim as a disparate impact claim. Defendants characterized his claim as one of disparate impact, and Plaintiff's response to the motion for summary judgment appears to accept that characterization. (Plf. Response, p. 23.) The court itself has reservations about the application of this rubric. Disparate impact claims under Title VII ordinarily challenge an employer's neutral hiring or promotion practices that to have the effect of limiting or excluding protected groups, for example, minorities or women. *See Price v. City of Chicago*, 251 F.3d 656 (7th Cir. 2001) (challenge to use of candidates' seniority and date of birth to break ties for promotions); *Bew v. City of Chicago*, 252 F.3d 891 (7th Cir. 2001) (challenge by African American and Hispanic police officers to use of Illinois Law Enforcement Officers Certification Examination).

Plaintiff's claims do not fit into the disparate impact framework because he does not allege or identify any neutral policy that excludes African Americans. To the contrary, Plaintiff asserts deliberate intentionally discriminatory policies and practices. Whether Plaintiff challenges a facially neutral practice or a systematic policy of discrimination, he bears the burden of proving that the challenged policy harmed him – that is, he must offer evidence that he was unable to obtain a teaching, administrative, or MSP position due to his race. Plaintiff has made no such showing here. Nor does Plaintiff allege that he sought an administrative position other than the one he held as Assistant Dean for Minority Affairs, or that he sought some other

employment opportunity with Rush but did not get the position because of his race. To the contrary, Plaintiff held precisely the positions from which he claims Rush had a policy to exclude him.

Plaintiff offered three statistics as evidence that Rush utilizes discriminatory hiring and promotion practices: (1) between 1990 and 1996, only 3.7% of the faculty was African American; (2) there were 52 African American faculty members in 1991, and only 33 in 1996, but the size of the faculty increased during that time; and (3) during 1990 and 1998 there were three African Americans with MSP contracts, but by 1998, all of them were "in one way or another, forced to close and disassociate . . . with Rush College." (Plf. Memo, p. 25.) These numbers, however, offer only the beginning of a statistical analysis that might establish evidence of disparate impact. As the Seventh Circuit has counseled Title VII disparate impact litigants, Plaintiff's statistics "must take into account the most common nondiscriminatory reasons for the alleged unfair employment practice," and "take into account the major variables one might expect to cause a statistical disparity." *Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1047 (7th Cir. 1991). Plaintiff here presents merely a few raw numbers without analysis to explain their statistical significance; even "[a] statistical analysis must cross a threshold of reliability before it can show even a prima facie case of disparate impact." *Id.*, quoting *Allen v. Seidman*, 881 F.2d 375, 378 (7th Cir. 1989). Plaintiff's numbers do not show a disparate impact.[13] Furthermore, even if he could

---

[13] The statistics here might be relevant to a claim of systemic disparate treatment. Again, the court recognizes that Plaintiff may have intended to raise such a claim, though he did not do so explicitly. In response to Defendants' motion for
(continued...)

28

have made such a showing, Plaintiff certainly could not show that he himself was injured by those practices such that he would have standing to bring a disparate impact claim.

## Individual Discrimination Claims

Plaintiff also raises an individual disparate treatment claim. Specifically, he alleges that Rush discriminated against him by: terminating him from his position as Assistant Dean for Minority Affairs; eliminating his Assistant Professor salary and teaching assignments; removing him from the Rush On Call physician referral service and the Rush physician directory; terminating his health insurance; removing two medical interns from their assignments with him; removing his name from the roster of the Department of Family Medicine; and failing, as recently as August 24, 1998, to provide him with a contract for his position as assistant dean. Plaintiff asserts that Rush has never taken any of these actions with a non-African American, but he offers no evidence to support that assertion.

## Burden Shifting Framework of McDonnell Douglas

---

[13](...continued)
summary judgment, however, he plainly followed Defendants' lead in treating the allegations within the disparate impact framework. Furthermore, aside from these three statistics, Plaintiff has not offered any evidence whatsoever of systemic disparate treatment. Even with respect to these numbers, Plaintiff has not presented any analysis, and therefore, the court is unable to draw any conclusions about their significance. Defendants, on the other hand, proffered a letter from Plaintiff's own attorney who refused to bring an EEOC claim on his behalf, in part because of her belief that the quantity of African American doctors who are satisfied with their employment or affiliation with Rush would undermine Plaintiff's claims. While there may be some doubt about the nature of Plaintiff's claims, the court concludes that Defendants have addressed each potential claim adequately and that there are no disputed issues of material fact.

The burden-shifting method of *McDonnell Douglas* is the indirect method of proving discrimination, and because Plaintiff has neither argued nor shown that he has direct evidence of discrimination by Rush, the court will proceed with the *McDonnell Douglas* analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff establishes a prima facie case of race discrimination by showing that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably. *See Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir.1999). If the plaintiff can establish a prima facie case, the employer must present a legitimate, non-discriminatory reason for the plaintiff's termination. *See Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir.1999). Plaintiff then bears the burden of proving that the employer's proffered reason is pretextual. *Id.* That is, once the employer offers a non-discriminatory reason for its decision, "the plaintiff must persuade the trier of fact that the true reason was a discriminatory one . . . ." *Wallace v. SMC Pnuematics, Inc.*, 103 F.3d 1394, 1399 (7th Cir. 1997).

**Plaintiff Did Not Make a Prima Facie Case or Show Pretext**

Plaintiff failed to make a *prima facie* showing of discrimination with respect to any of the actions that he alleged Rush took against him for discriminatory reasons. He offered absolutely no evidence that other similarly situated non-African American employees were treated more favorably. Although Plaintiff stated that non-African Americans were not subject to such actions, his conclusory allegations are insufficient: "conclusory allegations and self-serving affidavits, without support in the record, do not

create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002).

Even if Plaintiff had made a *prima facie* showing that he was the victim of racial discrimination, he would not succeed because Rush has offered a legitimate and non-discriminatory reason for each adverse action it took with respect to Plaintiff and Plaintiff has made no showing of pretext. First, Defendants state, and the record shows, that Plaintiff was fired as Assistant Dean for Minority Affairs because he improperly handled MSP funds, he refused to participate in the investigation of a discrimination complaint that he had lodged, and he was hostile and confrontational in the workplace.

With respect to Plaintiff's salary claims, Defendants state, and the record shows, that Plaintiff was never paid a separate salary for teaching. Instead, for Plaintiff and other physicians, participating in the teaching mission was in consideration for admitting privileges at Rush. The record also reflects the obvious reasons for Plaintiff's loss of salary: Rush ceased paying the MSP salary when the MSP terminated, and Rush no longer paid the assistant dean salary when Plaintiff was fired from that position.

Defendants' submissions also address Plaintiff's claim regarding removal of two interns from their assignments with Plaintiffs: Defendants took this action because, after Plaintiff had behaved in a hostile manner and refused to turn over money he owed Rush pursuant to the MSP contract, Rush lost confidence in his loyalty and judgment in supervising medical students.

The reasons for Plaintiff's removal from the Rush On Call referral service are

also well-supported in the record. Plaintiff had been retaining MSP funds that belonged to Rush and had temporarily closed his office to new patients and non-emergency current patients. Plaintiff provided no evidence that his name was removed from any directories in which he should have been listed. With respect to his charge that he was removed from the roster of the Department of Family Medicine in one notice about a meeting, Defendants explained that Schwer's secretary, Marsha Bellinger, did so because she thought his discharge as assistant dean meant he should no longer be on the roster. When Schwer discovered the mistake one week later, he promptly restored Plaintiff's name to the faculty roster. Similarly, the one-week cancellation of Plaintiff's health insurance was an unintentional error, and Plaintiff suffered no loss due to the accidental lapse in coverage.

Finally, Defendants state, and the record shows, that Defendants did not provide Plaintiff with a contract "as recently as August 24, 1998," because Defendants fired Plaintiff from that position on that date. Plaintiff demanded in writing to be paid a $225,000 salary as assistant dean. Rush did not refuse to "provide" Plaintiff with a contract; it simply declined to meet Plaintiff's demand that Rush more than quadruple his salary. Plaintiff provides no evidence that Rush's refusal to accept this demand was motivated by discriminatory animus. Nor does he offer evidence that Rush met such a substantial salary demand for any other administrator.

**Plaintiff Has Not Proven Retaliation**

The *McDonnell Douglas* burden shifting paradigm also applies to Plaintiff's claim that he was retaliated against in violation of 42 U.S.C. § 2000e-3 because he opposed Rush's allegedly unlawful and discriminatory practices. In order to establish

a prima facie case of Title VII retaliation, Plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by her employer; and (3) there is a causal link between his protected expression and the adverse action. *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996); *Brenner v. Brown,* 36 F.3d 18, 19 (7th Cir.1994). In order to demonstrate the causal link, Plaintiff must show that Rush would not have taken the adverse action but for his protected expression. *McKenzie,* 92 F.3d at 483; *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir.1985). If Plaintiff establishes a *prima facie* case, Rush can dispel any inference of retaliation by offering evidence of legitimate, non-discriminatory reason for its action.

Defendants' motion satisfies the court that there are no disputes of material fact concerning this claim. In reaching this conclusion, the court need not decide whether Plaintiff's speech constituted statutorily protected expression.[14] Plaintiff's claim fails because he provided no evidence of the causal link between his expression and the adverse actions. Plaintiff claims that Max Brown, General Counsel of Rush, threatened that his opposition to discrimination would lead to him being sued for misuse of funds. (Complaint, ¶ 85.) Plaintiff offers no evidence that this statement

---

[14]     There is at least come basis to question whether Plaintiff's evidence is sufficient on this issue. Plaintiff's expressions were complaints about how minority medical students concerns were addressed rather than about unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a); *Evans v. Kansas City Missouri School Dist.*, 65 F.3d 98, 101 (8th Cir. 1995) (found plaintiff's claims not remediable under Title VII where their "genesis . . . lies not with any allegation of a discriminatory employment practice, but rather with an allegation that . . . efforts to comply with a desegregation directive disregarded the needs of the black student population. . . .")

was made, and Defendants deny it. In fact, however, Rush did not sue Plaintiff for his misuse of funds until two years after the alleged statement, when Plaintiff brought this lawsuit and Defendants raised the misuse of funds issue as a counterclaim. If Brown made such a threat to Plaintiff, the lapse in time before Defendants counterclaimed for the MSP funds defeats any suggestion of a causal connection between Plaintiff's protests about discrimination at Rush and the counterclaim two years later for money he misappropriated. *See, e.g., Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995) (court noted the substantial 20 and 16 month time lapses that occurred between the protected expression and the adverse action when it found there was no causal link between the two); *Francisco v. West*, No. 98 C 3007, 2000 WL 877020, *3 (N.D. Ill. Jul. 3, 2000) (where two years lapsed between the protected expression and the adverse action, the "marked delay in the temporal sequence contraindicates a causal link between the two events"). Furthermore, the funds that Defendants counterclaimed for were wrongfully withheld by Plaintiff, and there is no evidence that Defendants counterclaimed for any reason other than to collect money to which it was entitled.

In support of his retaliation claim, Plaintiff also asserts that Brueschke "threatened" him in May 1998 by stating that "his opposition to discrimination would destroy a lot of lives but that in the end, [Plaintiff] would be left alone . . . with a 'Pyrrhic victory.'" (Plf. Memo, p. 28.) The court notes, first, that Brueschke's statement appears to be more of an observation than a threat. Plaintiff makes no attempt to show a connection between this statement and any adverse employment action, nor does the record indicate that such a connection exists. This statement standing alone

(which is the way Plaintiff presents it), simply does not show that Plaintiff was retaliated against because he engaged in protests about alleged discrimination.

Finally, Plaintiff asserts that Defendant retaliated against him by interfering with his alleged contracts with Hephzibah's House and with Health Associates, and with his employment contracts as an assistant professor and as Assistant Dean of Minority Affairs. Plaintiff appears to believe that the mere fact that adverse action occurs demonstrates retaliation. To the contrary, the case law is clear that Plaintiff must establish a connection between these actions and his complaints. *See Longstreet v. Illinois Dept. of Correction*, 276 F.3d 379, 384 (7th Cir. 2002). No evidence of such a connection appears here.

### Breach of Contract by Health Associates

Plaintiff claims that Health Associates breached its contract with him by failing to advertise his services in provider directories, blocking referrals to him, and ceasing to notify him of new purchase contracts. (Complaint, ¶ 53.) Defendants deny the claims and Plaintiff provides no evidence to substantiate any of them. At his deposition, Plaintiff did produce directories that did not list his name. None of these directories supports his claim, however, because each was produced after Plaintiff resigned from Health Associates or before Health Associates had a contract with the group that produced the directory, or listed medical specialities in which Plaintiff, a doctor of family medicine, was not certified. (Def. Memo, p. 25.) These directories do not suggest a breach of contract by Health Associates. Because "conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact," Plaintiff cannot survive summary judgment on this claim. *Hall,* 276 F.3d at

354.

## Tortious Interference Claims

Plaintiff alleges that Defendants tortiously interfered with his relationships with Hephzibah and Health Associates on various theories of tortious interference with his contracts, economic advantage and/or business expectancies. To succeed on any such claims under Illinois law, Plaintiff would have to show: (1) the existence of a valid and enforceable contract between the himself and a third party, or a reasonable expectation of entering into or continuing a business relationship; (2) Defendants' knowledge of the contract or expectancy; (3) Defendants' intentional and unjustified inducement of the third party to breach the contract, or interference that causes the third party to not allow the expectancy to ripen or to cancel the business relationship; and (4) resulting damages. *Wheel Masters, Inc. v. Jiffy Metal Products Co.*, 955 F.2d 1126, 1129 (7th Cir. 1992); *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 483-84, 693 N.E.2d 358, 370 (1998).

Plaintiff cannot make the requisite showing on the third element. Plaintiff has produced no evidence that the Rush Defendants interfered in any manner with representatives of either Hephzibah or Health Associates. Both Dr. Thomas Dent, the president of Health Associates, and Davida Ellen Williams, Director of Group Care at Hephzibah, have affirmatively stated that no one connected with Rush ever contacted them to discuss their respective relationships with Plaintiff, nor has either Dent or Williams discussed Plaintiff in any fashion with Defendants. Plaintiff's character-ization of the fact that Rush's General Counsel is married to the Executive Director of Hephzibah as evidence that Defendants tortiously interfered in his relationship with

Hephzibah is meritless. Defendants are entitled to summary judgment on each tortious interference count.

**Breach of Contract by Rush**

Plaintiff alleged in his complaint that he had an employment contract with Rush under which he provided medical teaching as an Assistant Professor and Rush paid him an annual salary of $110,000. (Complaint, ¶ 67.) He claims that Rush breached this agreement when it stopped paying him and failed to give him a non-renewal notice. Plaintiff also claims that Rush violated his contract as assistant dean when Brueschke fired Plaintiff without the approval of Rush's Governing Body. (Complaint, ¶ 80-82.)

Defendants deny that there was ever a contract under which Plaintiff would be paid the salary of $110,000 for medical teaching and Plaintiff has offered no evidence of such a contract. To the contrary, the record is replete with Plaintiff's complaints about the fact that he did *not* have a written contract with Rush for fiscal years 1998 and 1999, and with evidence of his persistent refusals to sign a contract when given the opportunity. Plaintiff's own affidavit states he did not have a written contract with Rush during fiscal years 1998 and 1999 and urges that this fact reflects discrimination because, "[t]o the best of [his] knowledge, no non-African American professor was subject to working without an employment contract for an entire year." (Plf. Aff., ¶¶ 20, 29). The court notes that Plaintiff has provided no evidence of what work he claims to have done pursuant to the contract he now seeks to enforce, for example, what classes he taught, or how many hours a week he supervised medical students. As stated earlier, Rush was entitled to stop paying Plaintiff's MSP salary when th MSP

was terminated, and to stop paying the assistant dean's salary when it terminated Plaintiff from that position.

Finally, Defendants did not breach any contractual provision when Brueschke fired Plaintiff without consulting the Governing Body. Plaintiff asserts, again without any evidentiary support, that his employment contract (the one that he complained did not exist) incorporated the Rules for Governance of Rush University (the "Rules"). Even if Plaintiff had such a contract that incorporating the Rules, nothing in the Rules requires the approval of the Governing Body before an assistant dean may be discharged. (Rules, Def. Ex. 79.)

Defendants are entitled to summary judgment on all counts alleging breach of contract with Plaintiff.

**Counterclaims**

Having initiated this lawsuit, Plaintiff now finds himself on the receiving end of legal process. The record is clear that Plaintiff retained $55,826.46 belonging to Rush that he had collected from patients pursuant to his MSP contract with Rush. Rush is entitled to this entire amount.

The record is also clear that Plaintiff owes Rush at least $72,384.76 on the Promissory Note. By the terms of the Promissory Note, the validity of which Plaintiff does not dispute, Rush may declare all of the unpaid principal balance and accrued interest immediately due and payable upon the termination of Plaintiff's employment by Rush. Rush terminated Plaintiff's employment on August 24, 1998 and Plaintiff, therefore, owes the unpaid principal balance and accrued interest from that date. Plaintiff claims to believe that he is not required to pay Rush until the parties have

negotiated repayment of the unpaid balance. A plain reading of the provision providing for such negotiation demonstrates that it applies only if Plaintiff terminated his employment with Rush: "Should you terminate your employment with Rush the repayment of the unpaid balance of this promissory note will be negotiated between yourself and the Dean of Rush Medical College in a manner which is satisfactory to the Dean." (Promissory Note, Def. Ex. 6.) This provision is clearly inapplicable here.

The court directs the parties to submit their respective calculations of the unpaid principal and accrued interest within 21 days. On review of these submissions, the court will enter judgment for the Defendants in an appropriate amount.

## CONCLUSION

Defendant's motion for summary judgment (Doc. No. 35-1) is granted.

ENTER:

Dated: March 26, 2002

REBECCA R. PALLMEYER
United States District Judge